■ Sheila Chestnut, as Executrix of Doris Fulton, Deceased, Appellant, v Marion Bobb-McKoy, M.D., et al., Respondents. [943 NYS2d 461]—

Order, Supreme Court, Bronx County (Stanley B. Green, J.), entered March 17, 2011, which, in this action alleging medical malpractice, granted defendants' motion to dismiss as time-barred all claims arising out of treatment rendered prior to October 11, 2005, unanimously modified, on the law, to the extent of only dismissing claims for treatment rendered before May 17, 2005, and otherwise affirmed, without costs.

On April 11, 2008, plaintiff commenced this action based on the failure to timely diagnose and treat lung cancer, leading to the unimpeded growth of the cancer and the patient's death. Plaintiff charges defendants with malpractice committed on May 30, 2002 through August 8, 2006. At issue is the viability of any claim for malpractice committed prior to October 11, 2005, which is, on its face, outside the $2^{1/2}$ year statute of limitations (*see* CPLR 214-a). Supreme Court rejected plaintiff's continuous treatment argument for the period in question, and dismissed any such malpractice claim as time-barred.

CPLR 214-a sets forth, in pertinent part, that "[a]n action for medical . . . malpractice must be commenced within two years and six months of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure." "Generally, a medical malpractice action accrues on the date of the alleged wrongful act" (*see Plummer v New York City Health & Hosps. Corp.*, 98 NY2d 263, 267 [2002], citing *Nykorchuck v Henriques*, 78 NY2d 255, 258-259 [1991]). However, where there is a continuous course of treatment for the conditions giving rise to the malpractice action, the running of the applicable statutory period is tolled during the period of continuous treatment (*see Young v New York City Health & Hosps. Corp.*, 91 NY2d 291 [1998]; *Langsam v Terraciano*, 22 AD3d 414 [2005]).

The continuous treatment doctrine tolls the $2^{1/2}$-year limitations period for medical malpractice actions when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint (CPLR 214-a; *Nykorchuck*, 78 NY2d 255; *McDermott v Torre*, 56 NY2d 399, 407 [1982]). "The premise underlying the doctrine is that a plaintiff should not have to interrupt ongoing treatment to bring a lawsuit, because the doctor not only is in a position to identify and correct the malpractice, but also is best placed to do so" (*Cooper v Kaplan*, 78 NY2d 1103, 1104 [1991]; *see also Ganess v City of New York*, 85 NY2d 733 [1995]). In the absence of continuing efforts by a doctor to treat a particular condition or complaint, however, those policy reasons do not justify the patient's delay in bringing suit (*Cooper* at 1104; *Allende v New York City Health & Hosps. Corp.*, 90 NY2d 333 [1997]).

With respect to failure to diagnose cases, courts have held that a "failure to make the correct diagnosis as to the underlying condition while continuing to treat the symptoms does not mean, for purposes of continuity, that there has not been treat-

ment" (*Hein v Cornwall Hosp.*, 302 AD2d 170, 174 [2003]; *Dellert v Kramer*, 280 AD2d 438 [2001]). Thus, a physician or hospital cannot escape liability under the continuous treatment doctrine merely because of a failure to make a correct diagnosis as to the underlying condition, where it treated the patient continuously over the relevant time period for symptoms that are ultimately traced to that condition (*Hill v Manhattan W. Med. Group—H.I.P.*, 242 AD2d 255 [1997]; *see e.g. Shifrina v City of New York*, 5 AD3d 660 [2004]).

Accordingly, in this case, the applicability of the continuous treatment doctrine to the defendants' dealings with plaintiff's decedent prior to October 11, 2005, turns on whether or not defendants were consistently treating and/or monitoring the decedent for specific symptoms related to lung cancer. Our review of the record establishes that prior to May 2005, there was no continuous treatment for symptoms that are ultimately traced to lung cancer. Plaintiff's own medical expert opines that during this time period—May 2002 through May 2005—the only symptom related to lung cancer that the doctors discovered was high alkaline phosphate levels, which consistently showed up in the decedent's blood work analysis. Nonetheless, other than noting that the levels were elevated, there is nothing in the record to show that defendants ever discussed these results with the decedent, much less agreed to monitor the abnormal readings at her future examinations. Thus, given that the patient was not aware of the need for further treatment of this condition, the decedent was not faced with the dilemma that the continuous treatment doctrine is designed to prevent, i.e. interrupting the treatment or monitoring a condition in order to protect her rights (*Young*, 91 NY2d at 296; *Allende*, 90 NY2d at 337-338).

The same cannot be said with respect to the activities that began on May 17, 2005. There is sufficient evidence on the record to raise an issue of fact as to whether the statute of limitations was tolled by the continuous treatment doctrine for the period from May 17, 2005 through August 9, 2006 (*Hill* at 255). Plaintiff's medical expert opines that four symptoms associated with lung cancer were manifested during this time period, namely bilateral knee pain, leg swelling, finger clubbing and high alkaline phosphate levels in the blood. From May 17, 2005 through August 9, 2006, a 13-month period, plaintiff's decedent visited the doctors at least four times for these conditions allegedly suggestive of lung cancer. At the inception, on May 17, 2005, the decedent was examined for her leg swelling, knee pain and toe fungus. The doctor recommended, inter alia, that the

patient elevate her feet to alleviate the leg swelling, and wear open toed shoes for the toe fungus. However, seven weeks later, July 6, 2005, the patient returned to the doctor with the recurring knee pain and swelling. This time, the doctor prescribed Tylenol and ordered an X ray of her knees. The X ray came out normal, but plaintiff's pain remained. The doctor continued to look for the source of the knee pain and leg swelling and ordered blood work (August 9, 2005), which revealed the high levels of alkaline phosphates. The next visit was eight months later, April 11, 2006, when the patient complained again about her knee pain. On this occasion, the doctor diagnosed the possible source of the pain as arthritis. The doctor prescribed Naproxyn and scheduled a further examination, which took place three months later, on July 14, 2006. On that day, the doctor addressed the recurring knee pain and swelling, as well as clubbing. At this time, the doctor prescribed Advair, and ordered blood work and an X ray of the lungs. Phone calls were made and a letter was sent to the decedent instructing her to follow-up with defendants. The X ray revealed a "large mass," which on August 9, 2006 was diagnosed as lung cancer.

In our view, this record, read in a light most favorable to plaintiff, presents a triable question of fact as to whether the decedent's visits to defendants from May 17, 2005 through August 9, 2006 were part of a continuous treatment for symptoms that are ultimately traced to lung cancer. During this relatively short period of 13 months, the doctor examined the decedent a total of four times, often at very short intervals (see Shifrina, 5 AD3d at 661-662). Significantly, during these visits, the doctors appeared to be actively engaged, albeit unsuccessfully, in attempting to find the source of the knee pain and swelling, as suggested by the many diagnostic tests performed, including the X ray and blood tests. Moreover, on at least one occasion (July 6, 2005), the doctor was sufficiently concerned about plaintiff's persistent knee pain and leg swelling that the doctor scheduled a follow-up examination. Based on the frequency and intensity of the course of treatment of plaintiff's knee condition, it cannot be said, as matter of law, that the decedent did not receive continuous treatment of such a condition, which, according to plaintiffs's expert, was a symptom, among others, ultimately traceable to the cancerous condition whose alleged misdiagnosis has given rise to this action (see Harris v Dizon, 60 AD3d 495 [2009]; Hein, 302 AD2d at 174; Williams v Health Ins. Plan of Greater N.Y., 220 AD2d 343 [1995]). Concur—Mazzarelli, J.P., Catterson, Moskowitz, Renwick and Abdus-Salaam, JJ.